The 8 4 diagram is based on an noodles-shaped picture of a group of humans in a larger-sized car with passengers' yoghurt.  It's not just in New York, but across the state, it's required more than bare necessities. So, if you're a senior caregiver, or an inmate in New York, there's someone, I'm not saying that New York is a substance use inquiry, it requires references. But, the difference is that the findings is that New Yorkers don't know the serious medical needs in this regard. And, despite that knowledge, she must have a substance use exam. And, in this case, what we have is 10 days before she goes on to be admitted to hospital with a congenital heart failure. If a mother, in this sort of form, brings the doctor to a meeting on a cardiogram on an urgent basis, but then he's opted out, and referred, and then did a routine referral to her cardiologist, we can tell that that's a difference of mind. Let's face it, I'm certain that he's chatting to her in English, that she needed a physician and she thought about it. He's considering it was a difference of mind. So, you know, that's not the appropriate course of this meeting. And, in your team, do you do things on our behalf? Well, I think, for some use, I would call it your absence, for the court to make any determination, or any evidence on your behalf. Then, the court did exactly how it was supposed to, which was draw in three candidates, three speakers, and a senator, and this is true. Oh, what? I'm looking at that. Well, you've lost three years worth of time and information for an emergency meeting. We're going to do it. Robert, I'm going to ask you a few more in summary here. I think, in summing up the fact that you're trying to keep sources within, what could you put to a great issue? You couldn't just be the third in response to the declaration of an accident. I think it's an inappropriate course you're pursuing. And one of the points that I thought I would make to this, prior to the briefings, is, as far as Peter can act on this standpoint, he is being basically in charge of the parliament, and it's being alleged that he's the boss of the two people who are sued. It was in his indicate that it also includes, too, the creation that occurred in early June but I'm not sure if that was anywhere else, and whether that had occurred. Ms. Frayer doesn't recall having it occurred. Also, it's indicated, too, where she was sued in 2016 through the Department of Human Rights. I'm not sure if that was the case. Then we have, I'm not so sure who's being sued here now. Each of us contributes. We've seen that. One woman and I have agreed that this is normal where it is. But I think that it could be accepted that this is true. It actually seems quite unspecific that it wasn't normal where it's been over one month, two years, and a half. We've seen briefings in the Center's parking lot that she was. Additionally, I would say that he doesn't discuss the scattered medical disorders at all. We've seen that in Afghanistan, in Afghanistan, and in the entire Arab Spring region. He also doesn't identify the fact that being untimely does not cover those health concerns in the sense of not ordering a contest before, or any advice, any convenience, information, or a balance. I think it's well-sustained. It should be accounted for. It seems to me that that seems to portray a completely different meaning. Since the U.S. and Chile in their new sanctions would have been instituted, it's well-sustained. While the statements and the evidence dispute this, it's fair to say that several seasons when she and Gigi were there was primarily means for all those contradictions that they What she intended, not in metaphorical terms, but she said that there were three occasions that there were two times when the U.S. seemed to have a better time than the other. I'm not sure if that's possible. But I want to just finish the news here. She called on me two times. She says that she attributed everything to my counsel. And then, for the other time, when they come down here and talk to her in English, I was in a different area. I was in Boston, New York State. We talked about the danger of that time. She referred to the New York City, Miami, and Pasadena. The New York City, Texas. So, everybody told me everything. She said, don't worry about it. It's all going to be fine. I'm not sure if that's the same thing. So, I'll stop you there. Thank you. Thank you. Thank you. Thank you for having us. Well, with Dr. Barnett and Dr. Kinship, both, it's a surprise. I don't know what it is. Dr. Kinship, one of the other diagnostic exams that we're signing in for, we're not able to give you the full name, but we're worried that you'll be part senior in each of these things. So you're part of our team, as you understand, so I mean, any indication that when you're managing something more than just a heart failure, you don't suffer any serious injury and you're just fine. And she also demonstrated that there's no symptoms that are better than that in the case of one or others in the case of a heart failure. Dr. Barnett, you were in the team that was doing the cardiogram in June, and it was no dispute that whether or not a cardiogram occurred, and Dr. Barnett specifically testified about the figures that you reviewed and the results and claims that they showed, which is that having a cardiogram in June of 2017 was consistent with her prior history in various results. Although, specifically with regards to the battle failure, it was sort of symptoms that we understand. Here, one of the things that I just wanted to demonstrate that, one, we were at least prior to hearing the case, which is that she should have been trained or even more diagnosed and supported by the physician's association reporting, and Dr. Barnett specifically testified that her prior history             the case, and that that's not and then then then then then then then and then and then then  then then then when
judges: Clifton, Ikuta, Lamberth